UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

|  |  |  |
|---|---|---|
| RAYMOND A. LONG, M.D., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 2:12-cv-81 |
| | : | |
| LLOYD GEORGE PARRY and | : | |
| DAVIS, PARRY & TYLER, P.C., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## Opinion and Order

Dr. Raymond Long brings the present action against his former attorney, Lloyd George Parry, Esq., and the law firm of Davis, Parry & Tyler, P.C. (collectively "Parry").  In his amended complaint, filed on November 20, 2014, Dr. Long asserts six causes of action.  Specifically, he alleges professional negligence, breach of contract, breach of fiduciary duty, violation of consumer protection laws, abuse of process, and malicious prosecution.

Now before the Court are (1) Parry's motion for summary judgment (ECF No. 102); (2) Dr. Long's cross-motion for partial summary judgment (ECF No. 142); (3) Dr. Long's second cross-motion for partial summary judgment (ECF No. 154);[1] (4) Dr.

---

[1] On February 19, 2016, Dr. Long filed a second cross-motion for partial summary judgment (ECF No. 154).  Dr. Long's second motion for summary judgment asks for the same ruling that he requested in his first motion-- namely, that the *Triad* defendants lacked immunity under the Health Care

Long's motion for leave to file a second amended complaint (ECF No. 97); (5) Parry's motion to file documents under seal (ECF No. 137); (6) Parry's motion to seal exhibits to Dr. Long's opposition to summary judgment (ECF No. 138); (7) Parry's motion to seal exhibits to Dr. Long's second motion for partial summary judgment (ECF No. 156); (8) Parry's motion for sanctions (ECF No. 123); (9) Parry's motion to strike and to exclude the report and opinions of William Jarvis, M.D. (ECF No. 107); and (10) a motion to quash subpoenas to testify at a deposition filed by non-parties Steven Sobel, M.D. and Kathryn Kirkland, M.D. (ECF No. 111).  For the reasons explained below, the Court **grants** Parry's motion for summary judgment**,** and **denies** Dr. Long's cross-motions for partial summary judgment and motion to amend**.** The Court also **grants in part and denies in part** all three of Parry's motions to seal**.**  The case is therefore dismissed, and the remaining motions are **denied** as moot.

## BACKGROUND[*]

The case at bar arises out of Parry's representation of Dr. Long in a lawsuit regarding the termination of Dr. Long's employment as a member of the medical staff at Northwestern

---

Quality Improvement Act.  Because the parties have already addressed that question at length, and because the Court denies Dr. Long's motions for summary judgment, the Court issues the present Order without awaiting a response from Parry.  The Court has, however, considered and addressed the novel arguments raised by Dr. Long in his second motion for summary judgment.

[*] The facts presented in this section are undisputed unless otherwise noted.

Medical Center ("NMC") in St. Albans, Vermont.  *See Long v. Triad Hosps. Inc.*, No. 2:05-cv-21 (D. Vt. Filed Jan. 24, 2005) ("*Triad*").  Because the Court's ruling in the present matter requires a thorough understanding of *Triad*, a detailed account of that case is presented below.

## I.  Dr. Long's Tenure at Northwestern Medical Center

In September 2001, Dr. Long obtained privileges to conduct his practice as an orthopedic surgeon at NMC for a provisional period of one year.  By all accounts, Dr. Long's relationship with the staff at NMC immediately became contentious.  Dr. Long had frequent relational issues with both the staff in the operating room and NMC CEO Peter Hofstetter.  As a result, at the end of Dr. Long's provisional period, NMC's Chair of Surgical Services, Michael Burfoot, wrote a letter to the Chair of the Credentialing Committee recommending that the hospital maintain Dr. Long's privileges on a provisional basis for an additional six months.  Although the hospital did not accept Dr. Burfoot's recommendation, it did postpone its decision of whether to grant Dr. Long active privileges until NMC's Surgical Service Subcommittee for Quality Assurance completed its review of Dr. Long's surgical cases.

In December 2002, shortly after learning that NMC had delayed its decision regarding his privileges, Dr. Long retained Attorney Gary McQuesten of Valsangiacomo, Detora & McQuesten,

P.C. to represent him in his dealings with the hospital.  Dr. Long met with NMC's Medical Executive Committee the following month, and on February 25, 2003, the hospital granted Dr. Long his active-status privileges.  Nonetheless, the troubles between Dr. Long and NMC persisted.  In March 2003, Attorney McQuesten sent a letter to counsel for NMC requesting that the hospital remove Dr. Burfoot's letter to the Credentialing Committee from Dr. Long's peer review file, and alleging that Dr. Long was aware of "no fewer than four serious incidents that . . . could have potentially impacted patient care," that were "motivated by some effort on the part of the staff to retaliate against Dr. Long for his success in gaining privileges."  ECF No. 102-2 Ex. G.  Dr. Long later filed a formal complaint with NMC and sent at least two additional letters to the hospital's counsel, each of which included accusations that certain staff at NMC had intentionally interfered with Dr. Long's ability to practice medicine.  *See, e.g.*, ECF No. 102-2 Ex. I (letter from Attorney McQuesten to counsel for NMC alleging "an orchestrated effort by CEO Hofstetter and others to interfere with the ability of [Dr. Long] to practice medicine, interfere with his right to do so both at the hospital and with patients, and to attempt to disrupt his practice of medicine, disrupt the care of his patients, and adversely affect his career.").  Counsel for NMC responded to Dr. Long's accusations with a letter addressing

each of his expressed concerns and explaining that the hospital had not treated Dr. Long differently than any other physician.

Between November and December 2003, as the letters went back and forth between the attorneys for Dr. Long and the hospital, Dr. Long conducted three shoulder surgeries in which his patients subsequently contracted infections with staphylococcus aureus bacteria.  In addition, Dr. Long performed two surgeries in late December 2003 that also resulted in infections--one by the water-borne bacteria serratia marcescens and the other by pseudomonas aeruginosa.  Dr. Long quickly hypothesized that the latter two infections had resulted from intentional contamination of a solution he had used during the surgeries, and to test his theory, he instructed a nurse to draw a sample from a bag of solution that had been prepared for his use in a later surgery.  Dr. Long then submitted the sample for testing to Fletcher Allen Health Care, which reported that the solution was heavily contaminated with staphylococcus aureus bacteria.[2]

In February 2004, after receiving the test results from Fletcher Allen, Dr. Long reported his theory of intentional contamination to the Vermont Attorney General's Office, the U.S.

---

[2] Parry notes that the laboratory was unable to reproduce the initial test results--a fact which Dr. Long interpreted as evidence that the laboratory had joined in NMC's conspiracy against him.  Dr. Long responds that the lab's inability to reproduce the initial test result showing 800 colony forming units of staphylococcus aureus per milliliter does not necessarily indicate that the subsequent tests did not show any contamination at all.

Attorney's Office in Vermont, the Vermont Medical Board, and the
Joint Commission on Accreditation of Healthcare Organizations.
None of those agencies found NMC or any individual associated
with the hospital to be criminally or civilly liable for the
infections at issue.  Moreover, the following month, Attorney
McQuesten wrote a letter to NMC's attorney explaining Dr. Long's
theory that individuals at the hospital had intentionally
contaminated Dr. Long's surgeries in order to achieve a number
of goals, including destroying Dr. Long's reputation and career
by "causing serious injury or death to his patients."  ECF No.
102-2 Ex. L at 4.  The letter indicated that Dr. Long had
consulted with an infectious disease expert who confirmed that
the relevant infections "could only take place as a result of
outside introduction to the operating room setting."  ECF No.
102-2 Ex. L at 2.  It concluded by asking the hospital to
utilize a polygraph machine and an expert on corporate
psychopaths to determine the root cause of the infections.

Several days later, on April 4, 2004, Attorney McQuesten
issued a press release describing the infections suffered by Dr.
Long's patients and indicating that NMC was under a criminal
investigation for intentional contamination.  The press release
suggested that individuals associated with the hospital
deliberately caused the contamination as a means to retaliate
against Dr. Long for his inquiry into NMC's anesthesia

complication rates.  Simultaneous to the press release, Dr. Long participated in an interview with a local television news program.  During the interview, Dr. Long reiterated his belief that the hospital intentionally contaminated the solution he used in the relevant surgeries "as part of a plot to harm his patients and ruin his career."  ECF No. 102-2 Ex. V.

The following day, on April 5, 2004, Dr. Long and Attorney McQuesten met with NMC's Medical Executive Committee regarding a peer review of Dr. Long.  In light of Dr. Long's repeated disputes with hospital staff and administration, as well as his strong conviction that employees of NMC were conspiring against him, a request for a corrective action review had previously been submitted to the Medical Executive Committee.  The Medical Executive Committee had referred the matter for investigation to the Ad Hoc Committee of the Surgical Service, which issued a report on March 16, 2004.  Immediately following its meeting with Dr. Long and Attorney McQuesten, the Medical Executive Committee released a decision recommending that NMC's Board take corrective action against Dr. Long.

In its recommendation, the Medical Executive Committee explained that it had "carefully reviewed the extensive history of Dr. Long's disputes with hospital administration and certain members of the hospital and medical staffs."  ECF No. 102-2 Ex. W at 1.  It proceeded to state that it was troubled by "Dr.

7

Long's apparent conviction that he is a victim of a criminal conspiracy on the part of the hospital CEO (and unidentified others)," and that based on its observations of Dr. Long, it was "deeply concerned as to his emotional stability and psychological well being."  ECF No. 102-2 Ex. W at 1.  As a result, the Committee requested that the Board require Dr. Long to "undergo a psychiatric evaluation in order to determine his present mental capacity to effectively and safely provide patient care" within 30 days of its recommendation.  ECF No. 102-2 Ex. W at 1.  The Committee further suggested that Dr. Long be required to provide "written notice that he will not perform any surgical procedures pending the Committee's receipt, review, and response to the evaluation report."  ECF No. 102-2 Ex. W at 2.  In the event that Dr. Long was unwilling to comply with such recommendations, the Committee indicated that it would summarily suspend his medical staff privileges.  Finally, the Committee urged the hospital to retain an outside infectious disease consultant to conduct "a comprehensive quality assurance review of post-operative infection rates, causes, and remedial actions."  ECF No. 102-2 Ex. W at 2.  The review was to include the post-operative shoulder infections identified by Dr. Long.

On April 6, 2004, NMC sent Dr. Long a copy of the Committee's Memorandum Decision as well as a letter explaining his right to request a fair hearing to contest the Committee's

recommendation.  Rather than request a fair hearing, however,
Dr. Long decided to resign.  On April 7, 2004, Dr. Long notified
the hospital that he was resigning his privileges, and on April
28, 2004, the NMC Board accepted his resignation.  As required
by the Health Care Quality Improvement Act, the hospital
proceeded to file an adverse action report with the National
Practitioner Data Bank indicating that Dr. Long had resigned
while a corrective action was pending.

On May 4, 2004, nearly a month after submitting his notice
of resignation, Dr. Long sent a letter to NMC's counsel
demanding a fair hearing.  The hospital denied Dr. Long's
request on the ground that he had voluntarily resigned his
privileges.

**II.  The *Triad* Suit**

In October 2004, Dr. Long contacted Attorney Lloyd George
Parry to discuss the possibility of bringing a legal action
against NMC.  Parry met with Dr. Long in his Philadelphia office
on several occasions, and prior to accepting the case, he asked
Dr. Long to undergo a psychological evaluation.  Dr. Long agreed
to the evaluation, and the psychologist found nothing of
concern.  Parry subsequently agreed to take the case.

On October 28, 2004, Parry and Dr. Long signed a Contingent
Fee Agreement in Parry's office in Philadelphia.  The agreement
provided that Parry would represent Dr. Long "in connection with

any and all legal claims which [Dr. Long] may have arising out
of actions taken by Northwestern Medical Center, Inc. ("NMC") of
St. Albans, Vermont, Peter Hofstetter, Michael Burfoot and
others in connection with the grant, reduction, or denial of
[his] privileges at NMC and any related damage, harm or injury
caused to [him]."  ECF No. 102-2 Ex. HH at 1.  In exchange, the
contract entitled Parry to 33 1/3% of any recovery, as well as a
$20,000 non-refundable, initial fee paid by Dr. Long.[3]  The
contract also indicated that Dr. Long would be responsible for
the costs of litigation.

In advance of filing suit, Dr. Long worked closely with
Parry to draft the complaint.  When finished, the pleading
sought $40 million in damages on the ground that certain
individuals at NMC had conspired to destroy Dr. Long's career in
order to eliminate competition and to retaliate against Dr. Long
for his seeking information regarding anesthesia complication
rates at the hospital.  The complaint included a federal
antitrust claim, as well as numerous state law claims ranging
from tortious interference with business to breach of contract.
Parry filed the complaint in January 2005.

Around the time the complaint was filed, Dr. Long contacted
Attorney Karin Zaner of Kane, Russel, Coleman, & Logan, P.C.

---

[3] Dr. Long states that Parry orally agreed to waive the provision of the
contract providing that the $20,000 retainer was non-refundable.

The Kane firm was based in Texas and had recently achieved a substantial jury verdict on behalf of a physician in a high-profile hospital privilege suit.  According to Dr. Long, Parry suggested that he contact Zaner to inquire into the firm joining his suit as co-counsel to assist with the federal antitrust claim.[4]  After receiving Dr. Long's inquiry, Zaner reviewed the facts of the case and sent Dr. Long an email indicating that there was a "very good chance" that Dr. Long would not recover any damages given the immunities frequently afforded to hospitals.  ECF No. 102-2 Ex. JJ.  Nevertheless, Zaner offered to accept the case provided that Dr. Long agree to a 10% contingency fee on top of Zaner's reduced hourly rate.  Dr. Long consented to that arrangement and signed a retainer with the Kane firm.  At the time of signing the retention agreement, Dr. Long was aware that his obligation to pay the Kane firm was entirely separate from his obligation to pay Parry.

During the next three years, Parry devoted a significant portion of his practice to Dr. Long's suit.  Parry began by focusing on motions practice, hearings, discovery, and depositions, while Zaner developed Dr. Long's antitrust claims. Over time, Zaner came to express concerns about the antitrust claims' viability.  Specifically, she noted in a letter to Dr. Long that she was uncertain as to whether the evidence supported

---

[4] Parry disputes that fact, asserting that he "did not advise or direct Dr. Long to retain Karin Zaner."  ECF No. 102-2 Ex. S at 2.

several elements of the claims, including (1) a concerted action between two people; (2) an unreasonable restraint of trade; and perhaps most importantly (3) an adverse effect in the relevant geographic market.  As Zaner wrote in her letter, "[i]f the Court were to determine that Burlington should be included with St. Albans as part of the same geographic market, then the antitrust claims most certainly would be dismissed."  ECF No. 102-2 Ex. RR at 4.

Approximately ten months into the case, Dr. Long fell behind on his payments to the Kane firm.  Zaner informed Dr. Long that she could not continue to work on his case until his bill was brought current, and after several additional months of nonpayment, Zaner transferred the antitrust work to Parry.  In her transfer letter to Parry, Zaner indicated that Dr. Robert Maness, the expert she had retained to conduct the initial analysis of Dr. Long's antitrust claims, had opined that St. Albans and Burlington are most likely too close together to be considered separate geographic markets.  Accordingly, Zaner recommended that Parry consider retaining a different expert, Dr. Clifford Fry, who was "much more open to the prospect that St. Albans and Burlington could be considered separate geographic markets."  ECF No. 102-2 Ex. SS at 2.

After three years of extensive discovery, including 30 depositions and thousands of pages of documents, mediation was

scheduled for January 2008.  It is undisputed that at that time,
Dr. Long had retained Dr. Clifford Fry to offer expert testimony
supporting Dr. Long's antitrust claim and request for damages.
It is also undisputed that Dr. Long had recently spoken to Dr.
William Jarvis about providing an expert opinion on the source
of the infections that resulted from Dr. Long's surgeries.[5]
Moreover, despite three years of active litigation, the parties
agree that although discovery provided some support for the
theory that the relevant infections were intentional, it did not
reveal any evidence demonstrating that the infections were
caused by the *Triad* defendants, or that the *Triad* defendants
acted with an anticompetitive motive.

    The two-day mediation began in Philadelphia on January 4,
2008.  Prior to sitting down, the *Triad* defendants had provided
Dr. Long with a copy of their mediation statement explaining the
various bases on which they intended to obtain summary judgment.
Included in their list of arguments were both the voluntariness
of Dr. Long's resignation and the immunities provided by the
Health Care Quality Improvement Act.  According to Dr. Long, he
and Parry began the mediation with a demand for $20 million.[6]
The defendants countered with $50,000, and for the remainder of
the two-day period, neither side made any significant movement.

---

[5] The parties do dispute whether Dr. Jarvis had been formally retained by the
start of mediation.

[6] Parry provides that he and Dr. Long opened with a demand of $15 million.

To the surprise of Dr. Long and Parry, the mediator approached them at the end of the second day and asked whether they would be interested in settling the case for $4 million. Both Dr. Long and Parry responded in the affirmative, and the mediator returned shortly thereafter to inform them that he had secured such an offer from the hospital's insurer.  Dr. Long and the insurer proceeded to sign an agreement, which provided in part that "[t]he insurers for the defendants shall pay $4 million to the plaintiff and his attorneys," that the case "shall be dismissed with prejudice," and that Dr. Long "shall deliver a general release of all claims against all defendants . . . ."  ECF No. 102-2 Ex. KK.  Dr. Long later reported that he was pleased with the settlement.

## III. Parry's Declaratory Judgment Action

Shortly after the settlement was reached, Dr. Long began a series of attempts to renegotiate the contracts that he had entered into with the various professionals that had assisted him with his case.  Dr. Long reached an agreement with Attorney Zaner to reduce her 10% contingency fee by half.  He also alleged to have negotiated a reduction in Attorney McQuesten's fee, and he declined to pay the bill of his antitrust expert, Dr. Fry.  In addition, Dr. Long engaged in a fee dispute with Parry.  According to Dr. Long, upon his request, Parry agreed to cover the unpaid costs of litigation, which amounted to $30,070.

14

Parry disputes Dr. Long's assertion, indicating that although he told Dr. Long he would address the matter with his partners, ultimately he declined to relieve Dr. Long of his obligation to pay the outstanding litigation costs due to the clear language in the Contingent Fee Agreement and the amount of work that he had put into the case.

When it came time to distribute the settlement funds, Dr. Long instructed the hospital's insurer to send him a check for $2.32 million.  The insurer sent the remaining $1.68 million to Parry.  Of the amount disbursed to Parry, Dr. Long requested that Parry pay $200,000 to Attorney Zaner and $155,000 to Attorney McQuesten.  Complying with Dr. Long's request, however, would have left Parry with $1,325,000--$8,333 short of Parry's 33% contingency fee, and without additional funds to cover the $30,070 of unpaid litigation costs.  As a result, Parry paid the full $200,000 to Zaner and only $116,296.49 to McQuesten.  He then placed the disputed $38,403 in escrow.

For the remainder of 2008, Dr. Long, Parry, and McQuesten attempted to reach a resolution regarding the disputed $38,403. Their efforts proved futile, however, and in December 2008, Parry and his firm filed a declaratory judgment action seeking to establish their entitlement to the funds.  Over the next sixteen months, the declaratory judgment action proceeded without resolution.  Due to the costs of litigation, Parry and

his firm voluntarily dismissed the suit and released the funds to Dr. Long in the spring of 2010.

## IV.  The Present Suit

Dr. Long initiated the present suit against Parry on April 24, 2012.  In his six-count amended complaint, Dr. Long brings claims of professional negligence, breach of contract, breach of fiduciary duty, and violation of consumer protection laws arising from Parry's performance in the *Triad* litigation.  Dr. Long also asserts claims of abuse of process and malicious prosecution relating to Parry's subsequent declaratory judgment action.

Parry now moves for summary judgment on all counts.  Dr. Long opposes Parry's motion and cross-moves for partial judgment in his favor.  In addition, Dr. Long moves for leave to file a second amended complaint to add allegations of deceit and fraud. Several other non-dispositive motions are also pending before the Court.

## DISCUSSION

## I.   Cross-Motions for Summary Judgment (ECF Nos. 102, 142, & 154)

### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Accordingly, when deciding a motion for summary judgment, courts must examine the evidence in the light most favorable to the nonmoving party, *Sheppard v. Beerman*, 317 F.3d 351, 354 (2d Cir. 2003), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Although the moving party bears the burden of establishing the absence of any genuine issue of material fact, *Anderson*, 477 U.S. at 256, in defending against a motion for summary judgment, the nonmoving party may not rely on "mere conclusory allegations, speculation or conjecture," *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).  Rather, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

17

The same legal standard applies where, as here, the parties have filed cross-motions for summary judgment. *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). That is, "each party's motion must be examined on its own merits, and in each case, all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*

**B. Professional Negligence (Count I)**

Parry first moves for summary judgment on Dr. Long's claim of attorney negligence. Under Vermont law, to succeed on a claim for attorney negligence, a plaintiff must prove "(1) the existence of an attorney-client relationship which establishes a duty of care; (2) the negligence of the attorney measured by his or her failure to perform in accordance with established standards of skill and care; and (3) that the negligence was the proximate cause of harm to plaintiff." *Hedges v. Durrance*, 834 A.2d 1, 3 (Vt. 2003). The measure of harm in a malpractice suit is "all damages proximately caused by the wrongful act or omission." *Bloomer v. Gibson*, 912 A.2d 424, 432 (Vt. 2006).

In the present case, Dr. Long's amended complaint asserts that Parry breached his duty to Dr. Long in a number of different ways. Principally, Dr. Long submits that Parry failed to develop certain evidence, including a report from an infectious disease expert showing that someone at NMC likely

18

contaminated Dr. Long's operations.  Had Parry advanced such evidence, Dr. Long claims that he would have received a larger settlement or a more favorable jury verdict.  In addition, Dr. Long alleges several other instances in which Parry deviated from the established standards of skill and care.  Those instances support alternative theories of damages, and include Parry's purported failure to (1) provide Dr. Long with tax advice regarding the settlement of *Triad*; (2) advise Dr. Long that he was responsible for the costs of litigation and additional counsel; (3) obtain a fair hearing for Dr. Long; and (4) persuade NMC to void its adverse action report to the National Practitioner Data Bank.  The Court will address each of Dr. Long's allegations in turn.

**1. Failure to Develop and Use Evidence**

As noted above, Dr. Long's primary claim for damages centers on the assertion that Parry's failure to develop certain evidence deprived Dr. Long of a more favorable outcome in his underlying case.  Parry now moves for summary judgment on that claim, arguing that Dr. Long has not made a sufficient showing to establish the elements of causation and damages.  For the reasons explained below, the Court agrees with Parry's contention.

Under Vermont law, a claim for attorney negligence cannot succeed where the alleged damages are based purely on

speculation. *Hedges*, 834 A.2d at 6 (citing *Fritzeen v. Gravel*, 830 A.2d 49, 54 (Vt. 2003)).  In his motion for summary judgment, Parry submits that Dr. Long's alleged damages are inherently speculative, as it is precisely the uncertainty of recovery at trial--or through settlement at some point in the future--that compels a party to settle.  In addition, Parry maintains that Dr. Long's underlying case faced two dispositive defenses that would have prevented the case from proceeding past summary judgment.  Namely, Parry asserts that Dr. Long's suit would have been barred by his voluntary resignation from NMC, as well as the *Triad* defendants' immunity under the Health Care Quality Improvement Act.  Given those weaknesses, along with the uncertainty intrinsic to a claim for damages based on an allegedly inadequate settlement, Parry argues that summary judgment is appropriate.

In his response, Dr. Long claims that the damages he seeks--the difference between his $4 million settlement and what he alleges that he would have achieved at trial or through a subsequent settlement had the case been tried competently--are not, in fact, speculative.  According to Dr. Long, the $6 million estimate of his economic losses that he received from his antitrust expert in *Triad* was unreliable, and he currently has a new expert who estimates that his damages were much greater.  Moreover, Dr. Long disputes the assertion that he

20

faced significant hurdles in *Triad*, and cross-moves for partial summary judgment on the underlying issues of whether his resignation was voluntary and whether the *Triad* defendants were entitled to immunity under the Health Care Quality Improvement Act.  Because he claims that he would have prevailed on those issues in *Triad*, Dr. Long submits that Parry's summary judgment motion should be denied.

Determining whether Dr. Long voluntarily resigned from NMC and whether the *Triad* defendants were entitled to immunity under the Health Care Quality Improvement Act has a significant impact on the extent to which Dr. Long's current claim for damages is speculative.  Accordingly, the Court addresses each of those issues below.

### a. Dr. Long's Departure from NMC

With respect to Dr. Long's departure from NMC, the Court finds that Dr. Long voluntarily resigned.  As this Court has previously recognized, "[a]n employee who resigns is presumed to have done so voluntarily." *Brown v. Windham Northeast Supervisory Union*, No. 2:05-CV-329, 2006 WL 2548198, at *10 (D. Vt. Aug. 31, 2006) (citing *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999); *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995); *Angarita v. St. Louis Cty.*, 981 F.2d 1537, 1544 (8th Cir. 1992)).  In order to overcome that presumption, the employee must establish that his or her

resignation was involuntarily extracted through either duress or deception. *Id.* Demonstrating a claim of involuntary resignation by means of duress requires an employee to show that he "reasonably believed that he 'had no other choice but to quit.'" *Id.* (quoting *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000)). In analyzing such a claim, courts utilize a totality-of-the-circumstances test, considering factors such as: "'(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.'" *Id.* (quoting *Hargray*, 57 F.3d at 1568).

Here, Dr. Long claims that his resignation was the product of duress. In support of his position, Dr. Long asserts that NMC failed to properly investigate the cause of the infections resulting from the operations he conducted in the final months of 2003. Consequently, when presented with the Medical Executive Committee's Memorandum Decision, Dr. Long claims that his only reasonable option was to resign, for complying with the Committee's recommendations would risk the health of his future patients. Because he was not given a reasonable alternative to

22

resignation, Dr. Long submits that his departure from NMC was involuntary.

Dr. Long's allegations, which focus on the first factor elucidated above, are not supported by the undisputed facts. The Medical Executive Committee's Memorandum Decision, issued at the conclusion of Dr. Long's peer review, clearly provided Dr. Long with two distinct options: (1) "undergo a psychiatric evaluation in order to determine his present mental capacity to effectively and safely provide patient care," or (2) face immediate suspension.  ECF No. 102-2 Ex. W at 1.  Had Dr. Long opted to partake in an evaluation, the Memorandum Decision further specified that he would have been required to provide the hospital "with written notice that he [would] not perform any surgical procedures pending the Committee's receipt, review, and response to the evaluation report."  ECF No. 102-2 Ex. W at 2.  In addition, and perhaps most importantly, the Memorandum Decision directed the hospital to retain outside infectious disease consultants for the purpose of conducting a "comprehensive quality assurance review of post-operative infection rates," which was to include the infections identified by Dr. Long.  ECF No. 102-2 Ex. W at 2.

Thus, contrary to Dr. Long's allegations, complying with the Committee's recommendation for a psychiatric evaluation posed no significant risk to his patients.  In the short term,

Dr. Long would have agreed to refrain from conducting surgery, and in the long term, outside infectious disease consultants were tasked to determine the root cause of the post-surgery infections.  For those reasons, the Court finds that Dr. Long could not have reasonably believed that he had no alternative to resignation.[7]

The remaining factors, which Dr. Long does not address, also favor a finding that Dr. Long voluntarily resigned.  With respect to the second factor, Dr. Long has made no claim that he did not understand the nature of the options presented by the Memorandum Decision.  Although Dr. Long may have unreasonably interpreted the Committee's recommendation to jeopardize the health of his patients, there is no evidence that Dr. Long's concern for his patients stemmed from a misunderstanding of the Memorandum Decision itself.  Rather, in light of the decision's clear language calling for an external review of post-operative infection rates, coupled with Dr. Long's protracted history of mistrusting NMC, it is likely that Dr. Long would have believed that his patients were at risk regardless of the options presented to him by the Committee.  This factor therefore supports a finding of voluntary resignation.

---

[7] As Parry mentions in his motion, Dr. Long had the additional option of requesting a fair hearing.  A fair hearing would have allowed Dr. Long to contest the Medical Executive Committee's recommendation, and Dr. Long received information regarding his rights to such a hearing in an April 6, 2004 letter from NMC CEO Peter Hofstetter.  *See* ECF No. 102-2 Ex. W.

As to the third factor--whether the employee had a reasonable amount of time to consider his options--the Memorandum Decision provided Dr. Long with four days to decide whether to sign the required authorization and notice, and thirty days to complete the psychiatric evaluation.  Dr. Long also received thirty days to make his request for a fair hearing.  Although a four-day period to choose whether to comply with the Committee's recommendations is arguably short, thirty days to request a fair hearing is not unreasonable. Accordingly, this factor does not weigh strongly in either direction.

Finally, the fourth and fifth factors both favor a finding of voluntary resignation.  Dr. Long selected his own date of resignation when he sent a letter to NMC on April 7, 2004 indicating that his resignation was effective immediately, and Attorney McQuesten had represented Dr. Long in his dealings with the hospital since December 2002.  Moreover, Attorney McQuesten was present at Dr. Long's peer review meeting with the Medical Executive Committee on April 5, 2004.  Both of those factors are therefore consistent with a voluntary resignation.

In consideration of the aforementioned factors, the Court concludes that no reasonable jury could find that Dr. Long's resignation was the product of duress.  Although Dr. Long may have subjectively believed that complying with Committee's

recommendation would have put his patients at risk, such a belief patently ignored the Committee's directive that NMC conduct an independent review of its post-operative infection rates.  It also overlooked the undisputed fact that Dr. Long could have requested a fair hearing to challenge the recommendations of the Medical Executive Committee.  Beyond the available alternatives to resignation, Dr. Long was offered thirty days to request a fair hearing, was able to choose his own resignation date, and was represented by counsel.  For all of those reasons, the Court finds as a matter of law that Dr. Long voluntarily resigned from NMC.

**b. Immunity under the Health Care Quality Improvement Act**

The Court next addresses the question of whether the *Triad* defendants were immune from liability for damages under the Health Care Quality Improvement Act ("HCQIA").  The HCQIA, codified at 42 U.S.C. §§ 11101-11152, provides that professional review bodies, their members and staff, and any person assisting such bodies "shall not be liable in damages under any law of the United States or of any State" with respect to a professional review action.  *Id.* § 11111(a)(1).  A "professional review action" is defined as "an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician

(which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician." *Id.* § 11151(9).

In order to qualify for protection under the Act, peer reviewers must satisfy four conditions provided in § 11112(a). Those conditions require that the professional review action be taken:

> (1)  in the reasonable belief that the action was in the furtherance of quality health care,
> (2)  after a reasonable effort to obtain the facts of the matter,
> (3)  after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
> (4)  in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain the facts . . . .

*Id.* § 11112(a). The review action is presumed to have met those conditions "unless the presumption is rebutted by a preponderance of the evidence." *Id.* Accordingly, on summary judgment, a district court assessing the application of the HCQIA must apply the following standard: "Might a reasonable jury, viewing the facts in the best light for [the physician], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" *Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir. 1992).

27

In the present case, the parties do not appear to dispute that the recommendations of the Medical Executive Committee qualify as professional review actions under the Act.[8]  Indeed, the MEC's directives, as specified in the Memorandum Decision, undoubtedly constitute "an action or recommendation . . . made in the conduct of professional review activity," which was based on the competence of Dr. Long and adversely affected his clinical privileges.  *See* 42 U.S.C. § 11151(9).  The parties do disagree, however, as to whether the MEC's recommendations satisfy the four conditions required for the *Triad* defendants to invoke the protections of the HCQIA.  The Court will evaluate each condition in turn.

### i.   Reasonable Belief that the Action was in the Furtherance of Quality Health Care

With respect to the first condition, it is clear that the MEC's recommendation that Dr. Long undergo a psychiatric evaluation was made "in the reasonable belief that the action was in the furtherance of quality health care."  *See id.* § 11112(a)(1).  In determining whether a professional review action is taken under the reasonable belief that it furthers quality health care, a district court must "apply an objective

---

[8] To be sure, Dr. Long does begin his discussion of HCQIA immunity with the contention that "[r]easonable jurors could easily find that the 'corrective action' against Dr. Long was not a 'professional review action'" within the meaning of the Act.  ECF No. 135 at 30.  Because Dr. Long does not elaborate on that argument, however, it is likely that he intended to write that reasonable jurors could conclude that the MEC's recommendations did not satisfy the four conditions required for immunity under 42 U.S.C. § 11112.

test which looks to the totality of the circumstances." *Gabaldoni v. Washington Cty. Hosp. Ass'n*, 250 F.3d 255, 261 (4th Cir. 2001) (internal quotation omitted).  Because the test is objective, "bad faith is immaterial."  *Austin*, 979 F.2d at 734.

Here, the undisputed facts establish that Dr. Long had frequent relational issues with both the operating room staff and NMC CEO Peter Hofstetter.  *See* ECF No. 102-2 Exs. A, G, H. In addition, in the final months of 2003, five of Dr. Long's patients developed post-operative infections.  After learning of his patients' infections, Dr. Long sent a sample of solution provided to him by the hospital for a subsequent surgery to the laboratory at Fletcher Allen Health Care.  ECF No. 102-2 Ex. L. The laboratory results came back positive for staphylococcus aureus, and as a result, Dr. Long formed the belief that NMC personnel intentionally caused the infections in order to destroy his career.  ECF No. 102-2 Ex. L.  Dr. Long then reported that belief to the Vermont Attorney General's Office, the U.S. Attorney's Office, and the local media.  ECF No. 102-2 Exs. B, N, U, V.  He also developed his own sterilization procedures that he implemented prior to surgery.  At the time of the MEC's recommendations, the cause of the infections resulting from Dr. Long's surgeries remained unknown. *See* ECF No. 102-2 Ex. W.

Based on those facts, there is no doubt that the Medical Executive Committee reasonably concluded that its recommendations would further the quality of health care at NMC. The scenario described above suggests two distinct causes of concern for the Committee.  First, the MEC may reasonably have been concerned about the mental health of Dr. Long given his strong conviction that hospital personnel intentionally infected their own patients in order to damage his career.  Second, the MEC may reasonably have been concerned about the root cause of the post-operative infections.  The MEC's recommendations specifically address each of those issues.  As the Committee wrote in its Memorandum Decision, "Dr. Long's apparent conviction that he [was] a victim of a criminal conspiracy on the part of the hospital CEO (and unidentified others)" caused the Committee to become "deeply concerned as to his emotional stability and psychological well being."  ECF No. 102-2 Ex. W at 1.  Consequently, based on its interest in "patient safety," the MEC recommended that Dr. Long "undergo a psychiatric evaluation in order to determine his present mental capacity to effectively and safely provide patient care."  ECF No. 102-2 Ex. W at 1.  In addition, the Memorandum Decision addressed the root cause of the post-operative infections by recommending that Surgical Services implement both an external infectious disease review and an external quality assurance review.  The infectious

30

disease review was suggested to "include, but not be limited to, the post-operative shoulder infections identified by Dr. Long." ECF No. 102-2 Ex. W at 2.  In sum, the two-pronged approach urged by the MEC specifically targeted both areas of concern for patient safety that arose out of Dr. Long's activity at NMC. Such an approach conclusively demonstrates that the Committee's recommendations were made in the reasonable belief that they were furthering quality health care.

In his second motion for partial summary judgment, Dr. Long contests the notion that the MEC reasonably believed that its actions would improve the quality of NMC's health care.  In particular, Dr. Long argues that the Committee made its recommendations not out of concern for patient safety, but in retaliation for his filing a complaint with the Vermont Attorney General's office.  Dr. Long adds that the Committee was further motivated to act by a personal vendetta between himself and CEO Hofstetter, as evidenced by allegations that Hofstetter had previously attempted to force him to resign from NMC.

Dr. Long's arguments fail to rebut the presumption set forth in the HCQIA.  In support of his contention that the MEC's recommendations were retaliatory, Dr. Long relies on two pieces of evidence: (1) the fact that his peer review began less than a month after he filed his complaint with law enforcement; and (2) a statement in a letter from Hofstetter to MEC Chair James

31

Duncan requesting that the Committee consider initiating a corrective action review against Dr. Long, which provides that "I would also remind you that NMC is currently being investigated by the State Attorney General's office based on an anonymous telephone call they received regarding an alleged tampering of IV fluids in Dr. Long's cases." ECF No. 154-22 at 2.

Contrary to Dr. Long's assertion, those facts alone would not allow a reasonable jury to find, by a preponderance of the evidence, that the MEC issued its recommendations in order to retaliate against Dr. Long. To begin, as Hofstetter's statement indicates, Dr. Long filed his complaint anonymously. Thus, it is unclear whether Hofstetter or the Committee knew that the complaint was made by Dr. Long. Moreover, even assuming that the hospital did know that Dr. Long had filed the complaint, the Committee was outwardly concerned with the allegations that the complaint expressed. As explained above, the MEC recommended that Dr. Long undergo a psychiatric evaluation because Dr. Long's "apparent conviction that he is a victim of a criminal conspiracy on the part of the hospital CEO (and unidentified others)" created a concern for his own emotional stability and the safety of the hospital's patients. ECF No. 102-2 Ex. W at 1. Therefore, even viewing the evidence in the light most favorable to Dr. Long, the expressed concerns of the MEC

establish that it acted in light of, and not in retaliation for, the allegations asserted in Dr. Long's complaint.

Dr. Long's argument regarding his personal vendetta with Hofstetter is similarly unavailing. Even accepting his claims that Hofstetter had previously attempted to force him to resign from NMC, Dr. Long has failed to show how Hofstetter's reputed rancor influenced the MEC's recommendations. The Committee did not terminate Dr. Long's privileges without reason. Rather, the MEC issued several recommendations that were closely tailored to the objective concerns arising from Dr. Long's behavior. In consideration of the undisputed facts and the nature of the MEC's actions, Dr. Long's evidence of his feud with Hofstetter, who was not a member of the MEC, simply would not allow a reasonable jury to conclude that the Committee acted out of spite.

As stated above, Dr. Long bears the burden of providing sufficient evidence to permit a jury to find, by a preponderance of the evidence, that the MEC's recommendations were not made in the reasonable belief that they furthered quality health care. *See* 42 U.S.C. § 11112(a). Given the undisputed facts supporting the MEC's actions, the evidence presented by Dr. Long has not satisfied that burden. Accordingly, the Court finds that the MEC's recommendations satisfy the first condition specified in 42 U.S.C. § 11112(a)(1).

## ii.   Reasonable Effort to Obtain the Facts

In evaluating the second condition under 42 U.S.C. § 11112(a)(2), the proper inquiry is "whether the 'totality of the process' leading up to the professional review action evinced a reasonable effort to obtain the facts of the matter." *Meyers v. Columbia/HCA Healthcare Corp.*, 341 F.3d 461, 469 (6th Cir. 2003) (internal citation omitted).  In his second motion for partial summary judgment, Dr. Long contends that the MEC failed to satisfy this condition, as it did not hire an infectious disease expert to determine the cause of the post-operative infections prior to issuing its Memorandum Decision.

Dr. Long was "entitled to a *reasonable* effort, not a perfect effort."  *Poliner v. Texas Health Sys.*, 537 F.3d 368, 380 (5th Cir. 2008) (citing *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 43 (1st Cir. 2002)).  Here, after receiving the request for corrective action regarding Dr. Long, the MEC referred the matter to the Ad Hoc Committee of the Surgical Service for investigation.  The Ad Hoc Committee subsequently provided a report to the MEC, which considered the report and met with Dr. Long and Attorney McQuesten prior to issuing its decision.  ECF No. 102-2 Ex. W at 1.  Moreover, as expressed in its Memorandum Decision, "[t]he Medical Executive Committee, collectively and individually, ha[d] met with Dr. Long and repeatedly discussed numerous areas of concern."  ECF

34

No. 102-2 Ex. W at 1.  The Committee had also "carefully reviewed the extensive history of Dr. Long's disputes with hospital administration and certain members of the hospital and medical staffs."  ECF No. 102-2 Ex. W at 1.

Given Dr. Long's widely expressed belief that he was the victim of a criminal conspiracy, coupled with the nature of the MEC's concerns, the actions described above demonstrate a reasonable effort to obtain the facts related Dr. Long's peer review.  Although it may have been preferable for NMC to contract for an infectious disease review earlier, the fact that the Committee did not make such a request until it issued its recommendation that Dr. Long undergo a psychological evaluation does not render its fact-gathering efforts unreasonable. Accordingly, the Court finds that the MEC's actions satisfy the second condition under 42 U.S.C. § 11112(a)(2).

### iii. Adequate Notice and Hearing Procedures

The third condition for protection under the HCQIA requires that a peer review action is taken "after adequate notice and hearing procedures are afforded to the physician involved." 42 U.S.C. § 11112(a)(3).  A professional review body may satisfy that condition in one of two ways.  First, it may comply with the "safe harbor" notice and hearing procedures set forth in 42 U.S.C. § 11112(b).  Second, it may provide "other procedures as are fair to the physician under the circumstances."

*Id.* § 11112(a)(3).  In addition, the aforementioned condition
notwithstanding, a professional review body may immediately
suspend or restrict clinical privileges, "subject to subsequent
notice and hearing or other adequate procedures, where the
failure to take such an action may result in an imminent danger
to the health of any individual."  *Id.* § 11112(c).

In the present case, the facts surrounding Dr. Long's
departure from NMC are largely undisputed.  On April 6, 2004,
the day after Dr. Long met with the MEC regarding his peer
review, NMC CEO Peter Hofstetter sent Dr. Long a letter
attaching the MEC's Memorandum Decision and advising him of his
right to request a fair hearing.  The Memorandum Decision
clearly requested that the Board of Directors adopt two
principal recommendations.  First, it urged that the Board
require Dr. Long to undergo a psychiatric evaluation within 30
days of its decision, and second, it suggested that the Board
provide for an external infectious disease review and an
external quality assurance review.  Moreover, the Memorandum
Decision plainly stated that if Dr. Long refused to (1) comply
with the psychological evaluation process; or (2) "provide the
Committee by April 9, 2004, with written notice that he will not
perform any surgical procedures pending the Committee's receipt,
review, and response to the evaluation report," then the
Committee would "summarily suspend [his] medical staff

36

privileges pursuant to Bylaw § 8.2-1 to protect the health and safety of patients and to prevent serious disruptions to the operations of the Hospital." ECF No. 102-2 Ex. W at 2. The accompanying letter thoroughly explained Dr. Long's right to contest the Committee's recommendations by requesting a fair hearing within the thirty days to follow. ECF No. 102-2 Ex. X.

On April 7, 2004, the day after he received the MEC's Memorandum Decision and the letter regarding his right to a fair hearing, Dr. Long submitted his notice of resignation to NMC. Dr. Long's letter indicated that his resignation was effective immediately, and the NMC Board accepted his resignation at its meeting on April 28, 2004. Subsequently, on May 4, 2004, Dr. Long sent a notification to the hospital requesting a fair hearing. ECF No. 135-11. In a written response dated May 10, 2004, the hospital denied Dr. Long's request, indicating that his "resignation from the Medical Staff on April 7, 2004 [made him] ineligible to exercise the Northwestern Medical Center's Fair Hearing procedures." ECF No. 102-2 Ex. Y.

Based on those undisputed facts, Dr. Long argues that the MEC's actions fail to satisfy the third condition for protection under the HCQIA in two distinct ways. First, Dr. Long asserts that the *Triad* defendants improperly denied his request for a fair hearing. The parties agree that Hofstetter's April 6, 2004 letter provided Dr. Long with adequate notice of both the MEC's

37

proposed action and his right to request a fair hearing.
Indeed, the rights elucidated in Hofstetter's letter closely
tracked the rights enumerated in 42 U.S.C. § 11112(b).  *See* ECF
No. 102-2 Ex. X.  The parties disagree, however, as to whether
Dr. Long's resignation constituted a voluntary waiver of his
right to a fair hearing under the HCQIA.  According to Dr. Long,
physicians retain their right to a fair hearing after
resignation, as their interest in such a hearing transcends
their relationship with any given hospital.  In support of his
position, Dr. Long notes that 42 U.S.C. § 11133(a) requires
health care entities to file adverse action reports with the
Board of Medical Examiners when physicians resign during an
investigation into their possible incompetence or improper
professional conduct.  Because such reports may negatively
impact a physician's ability to gain employment at another
health care entity, Dr. Long contends that a physician's right
to challenge corrective actions must continue after resignation.

Dr. Long's argument is unpersuasive.  To begin, the Court
agrees with Parry that simple logic suggests that the HCQIA's
fair hearing requirement applies only when a physician remains
associated with the health care entity.  As the statute makes
clear, the fair hearing procedure under the HCQIA provides a
physician with a means to contest a professional review action
taken against her.  *See* 42 U.S.C. § 11112(b)(3).  The HCQIA

38

defines a professional review action as one that "affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician." *Id.* § 11151(9). Thus, to put it differently, a fair hearing under the HCQIA allows a physician the opportunity to protect her clinical privileges. When a physician voluntarily resigns, she knowingly relinquishes such privileges. Accordingly, voluntary resignation effectively dissolves a physician's interest in a fair hearing, as once the physician resigns, she no longer possesses clinical privileges that she can protect through the fair hearing process.

In addition, contrary to Dr. Long's assertion, a continued right to a fair hearing after resignation would not allow physicians to effectively challenge adverse reports filed with the Board of Medical Examiners. As the reporting provision indicates, it is not the professional review action itself that triggers reporting, but rather the physician's resignation during "an investigation by the entity relating to possible incompetence or improper professional conduct." *Id.* § 11133(a)(1)(B). Thus, because it is immaterial under the statute how the investigation resolves, a subsequent fair hearing would have no impact on the HCQIA's reporting requirement. Moreover, the statute requires that health care entities file the relevant reports "regularly (but not less

39

often than monthly).” *Id.* § 11134(a).  Such a frequent
reporting requirement is also inconsistent with a continued
right to request a fair hearing after resignation.

For all of those reasons, the Court finds that a physician
voluntarily waives the adequate notice and hearing requirements
under 42 U.S.C. § 11112(a)(3) when she voluntarily resigns.  *See*
*Brown v. Med. College of Ohio*, 79 F. Supp. 2d 840, 843 (N.D.
Ohio 1999) (providing that “[a] physician who voluntarily
surrenders privileges during an investigation of professional
misconduct or in return for the hospital not conducting an
investigation is deemed to have waived [the HCQIA’s due process]
protections.”).  Accordingly, the *Triad* defendants did not fail
to provide Dr. Long with sufficient due process when they denied
his request for a fair hearing after accepting his voluntary
resignation.

Next, Dr. Long contends that the MEC failed to satisfy the
third condition for protection under the HCQIA by summarily
suspending his clinical privileges without prior notice or a
hearing, and without a finding that suspension was necessary to
avoid imminent danger to the health of an individual.  As noted
above, in order to satisfy the requirements for protection under
the HCQIA, a professional review body generally must afford a
physician adequate notice and hearing procedures prior to
imposing a corrective action.  42 U.S.C. § 11112(a)(3).  The

statute does allow for an immediate suspension subject to
subsequent due process procedures, however, "where the failure
to take such an action may result in an imminent danger to the
health of any individual." *Id.* § 11112(c)(2).  In determining
whether an immediate suspension was justified under the statute,
the Eighth and Ninth Circuits have held that "'the [HCQIA] does
not require imminent danger to exist before a summary restraint
is imposed.  It only requires that the danger *may* result if the
restraint is not imposed.'" *Sugarbaker v. SSM Health Care*, 190
F.3d 905, 917 (8th Cir. 1999) (quoting *Fobbs v. Holy Cross
Health Sys. Corp.*, 29 F.3d 1439, 1443 (9th Cir. 1994)) (emphasis
and alterations in original).

     Here, Dr. Long argues that the MEC's Memorandum Decision
and the accompanying letter from Hofstetter amounted to an
immediate suspension, as both documents indicated that the
Committee would summarily suspend Dr. Long's privileges if he
declined to undergo a psychiatric evaluation, or if he failed to
"provide the Committee by April 9, 2004, with written notice
that he [would] not perform any surgical procedures pending the
Committee's receipt, review, and response to the evaluation
report." ECF No. 102-2 Ex. W at 2; *see also* ECF No. 102-2 Ex.
X.  Dr. Long further submits that such an immediate suspension
falls outside the protections of the HCQIA because the MEC did
not have reason to believe that he presented a risk of imminent

danger to his patients.  In support of position, Dr. Long notes that the hospital did not begin investigating the cause of his infections until March 2004, he did not have any additional cases of surgical infections after January 12, 2004, and that his surgical privileges were increased six days before the MEC issued its Memorandum Decision.  For his part, Parry maintains that the threat of suspension did not equate to an immediate suspension, and therefore, a finding of imminent danger was unnecessary.

Initially, the Court agrees with Dr. Long that threatening him with summary suspension if he refused to accept the MEC's recommendations amounted to an immediate suspension.  The MEC's Memorandum Decision and Hofstetter's letter both made clear that the MEC would summarily suspend Dr. Long's privileges within three days unless he complied with the Committee's directives. *See* ECF No. 102-2 Ex. W.  The MEC's decision was not preceded by any notice or a hearing, and the three-day buffer it offered did not provide Dr. Long with a meaningful opportunity for due process.

Even accepting the MEC's action as an immediate suspension, however, the Court has little trouble finding that such an action was appropriately based on a reasonable belief that Dr. Long may have presented an imminent danger to the health of his patients.  As explained previously, at the time it issued its

42

decision, the MEC was aware that a number of Dr. Long's patients had recently suffered from rare, post-operative infections. The MEC did not know the cause of the infections, and it had significant concerns about Dr. Long's mental health given his quick conclusion that hospital staff had deliberately infected their own patients in order to destroy his career. Notwithstanding the issues raised by Dr. Long, those facts alone support the MEC's decision to summarily suspend Dr. Long in order "to protect the health and safety of patients . . . ." ECF No. 102-2 Ex. W at 2. Thus, because the MEC had reason to believe that a failure to act *may have* resulted in a danger to the hospital's clientele, and because the Memorandum Decision plainly provided Dr. Long with notice and the right to request a subsequent hearing, the summary suspension of Dr. Long did not fall outside the bounds of 42 U.S.C. § 11112(c)(2).

To summarize, the Court concludes that Dr. Long received adequate process under the HCQIA for both the MEC's recommendations to the Board and the MEC's summary suspension of Dr. Long's clinical privileges. With respect to the MEC's recommendations, Dr. Long was afforded sufficient notice and hearing procedures that were nearly identical to the "safe harbor" measures specified in 42 U.S.C. § 11112(b). When Dr. Long resigned, he voluntarily waived his interest in a fair hearing, thereby relieving the MEC from its obligation to

43

provide such a hearing in order to qualify for protection under the HCQIA.  As to the MEC's summary suspension of Dr. Long's clinical privileges, the facts known to the Committee at the time of its decision clearly supported its determination that Dr. Long may have presented an imminent risk of danger to his patients, and the Memorandum Decision provided for a subsequent hearing at Dr. Long's request.  The *Triad* defendants therefore satisfied the notice and hearing requirements under § 11112(a)(3) and § 11112(c), and no reasonable jury could find otherwise.

### iv.  Reasonable Belief that the Action was Warranted by the Facts Known

The final condition for protection under the HCQIA requires that the professional review body acted "in the reasonable belief that the action was warranted by the facts known after [a] reasonable effort to obtain facts" and after providing adequate notice and hearing procedures.  42 U.S.C. § 11112(a)(4).  "Our analysis under § 11112(a)(4) closely tracks our analysis under § 11112(a)(1)."  *Poliner*, 537 F.3d at 384 (citing *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 843 (3d Cir. 1999)); *see also Meyers*, 341 F.3d at 471; *Sugarbaker*, 190 F.3d at 916.

In the present case, the actions taken by the MEC-- temporarily suspending Dr. Long, recommending that he undergo a

44

psychiatric examination, and urging the hospital to conduct an outside infectious disease review--were "tailored to address the health care concerns" raised by the facts available to the Committee at the time of its decision. *See Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 638 (3d Cir. 1996). Moreover, Dr. Long has produced insufficient evidence to rebut the presumption that the MEC's actions were taken in the reasonable belief that they were warranted. As explained above, Dr. Long relies on the timing of his peer review, a statement written by CEO Hofstetter, and evidence of a personal vendetta between himself and Hofstetter to argue that the Committee issued its recommendations not out of concern for patient safety, but out of spite and a desire to retaliate against Dr. Long. Given the objective healthcare concerns presented by the undisputed facts, however, such evidence cannot overcome the statutory presumption by a preponderance of the evidence. Accordingly, MEC's actions satisfy the requirements of 42 U.S.C. § 11112(a)(4) as well.

Based on the analysis set forth above, the Court concludes that Dr. Long has failed to rebut the presumption that the MEC satisfied the HCQIA's conditions for protection. Accordingly, in the underlying suit, the *Triad* defendants were immune from liability for damages under the HCQIA as a matter of law.

45

### c. The Impact of Dr. Long's Voluntary Resignation and the *Triad* Defendants' HCQIA Immunity on the Underlying Claims

Having found that Dr. Long voluntarily resigned from NMC and that the *Triad* defendants were immune from liability for damages under the HCQIA, the Court now turns to the claims in the underlying suit to assess the impact that its findings would have had in that case.  In *Triad*, Dr. Long asserted ten different causes of action: (1) combination and conspiracy in violation of the Sherman and Clayton Acts; (2) tortious interference with prospective business advantage; (3) tortious interference with contract; (4) tortious interference with business; (5) breach of contract; (6) defamation, libel, and slander; (7) false light; (8) outrage; (9) negligent hiring/supervision; and (10) violation of the HCQIA.[9]  *See* Amended Complaint, *Long v. Quorum Health Res., LLC*, Docket No. 2:05-cv-21-WKS (Doc. 197), at 74-95.  Parry argues that because the Court's findings would have necessitated a summary judgment ruling in favor of the *Triad* defendants on all of those claims, Dr. Long cannot demonstrate any damages in the present case. Dr. Long disputes that notion, suggesting that despite the

---

[9] Dr. Long's claimed violation of the HCQIA appears to be less a cause of action than a simple assertion that the *Triad* defendants were ineligible for immunity under the statute.  Regardless of how the claim is classified, however, it was not likely viable as an independent claim, as numerous circuit courts have held that the HCQIA does not provide a private cause of action.  *See Singh*, 308 F.3d at 45 n. 18; *Wayne v. Genesis Med. Ctr.*, 140 F.3d 1145, 1148 (8th Cir. 1998); *Bok v. Mut. Assurance, Inc.*, 119 F.3d 927, 928-29 (11th Cir. 1997); *Hancock v. Blue Cross-Blue Shield, Inc.*, 21 F.3d 373, 374-75 (10th Cir. 1994).

Court's findings, some of his claims would have survived summary judgment.

Upon review of the *Triad* complaint, it is clear that the majority of Dr. Long's claims would not have survived a motion for summary judgment in the underlying case.  The counts alleging a violation of the Sherman and Clayton Acts, tortious interference with prospective business advantage, tortious interference with contract, tortious interference with business, breach of contract, outrage, and negligent hiring/supervision all relied heavily on the assertion that Dr. Long was improperly discharged from NMC.  *See id.*  The Court's finding that Dr. Long voluntarily resigned would have been fatal to those claims.  In addition, with the exception of the claim for negligent hiring/supervision, those same causes of action all involved professional review actions, for which the *Triad* defendants were immune from damages under the HCQIA.  Such immunity would have further precluded Dr. Long from recovering damages on any of the aforementioned claims.

Although the Court's findings in this case would have disposed of the bulk of Dr. Long's claims in *Triad*, several of the underlying counts may have withstood a motion for summary judgment.  Specifically, the causes of action for defamation, libel, slander, and false light would not have been impacted by Dr. Long's voluntary resignation or the *Triad* defendants' HCQIA

immunity, as they were unrelated to Dr. Long's departure from
NMC and any professional review action conducted by the
hospital.  Even if those counts had overcome summary judgment,
however, their combined requested relief totaled only $300,000.
*See id.* at 86-91.  Thus, in light of Dr. Long's $4 million
settlement, it cannot be said that success on the defamation,
libel, slander, and false light claims alone would have led to a
more favorable result after trial.

Additionally, Dr. Long argues that HCQIA immunity was not a
dispositive defense in the underlying suit because it would not
have impeded his demands for injunctive relief.  Such an
argument is unavailing for two reasons.  First, even if the
*Triad* defendants had not qualified for HCQIA immunity at all,
Dr. Long's voluntary resignation from NMC was fatal to his most
significant causes of action.  Second, although Dr. Long is
correct in his assertion that HCQIA immunity does not preclude a
court from granting equitable relief, the possibility that he
may have obtained an injunction in the underlying suit is
inconsequential in the present matter.  In this case, Dr. Long's
claim for damages hinges on his ability to show that, but for
Parry's negligence, he would have achieved a more substantial
settlement or a greater verdict after trial.  The fact that the
*Triad* defendants' HCQIA immunity did not prevent Dr. Long from
pursuing an equitable remedy does not bear on that assessment.

Ultimately, because a majority of the claims presented in *Triad* would not have survived a motion for summary judgment, Dr. Long cannot show that Parry's purported negligence caused him to receive a suboptimal settlement in the underlying case. Moreover, even if Dr. Long had found a way to advance his full suit to trial, the Court's findings in the present case significantly weaken the *Triad* claims such that Dr. Long's alleged damages are too speculative to support his claim for professional negligence. *See McKnight v. Dean*, 270 F.3d 513, 519 (7th Cir. 2001) (affirming district court's grant of summary judgment on attorney malpractice claim in favor of the defendant on ground that "there is no basis for believing that [the plaintiff] would have done better by rejecting the settlement and going to trial; and if there is no injury, there is no tort."). Dr. Long voluntarily resigned from NMC. In a subsequent lawsuit premised largely on his alleged constructive discharge, Dr. Long extracted a settlement of $4 million. Such a settlement is impressive based on those facts alone, never mind that the *Triad* defendants were immune from liability for damages arising out of their involvement in Dr. Long's peer review. In the present matter, in order to survive summary judgment on his claim for professional negligence based on Parry's failure to properly develop his underlying case, Dr. Long needed to produce some evidence demonstrating that, but for

Parry's alleged negligence, he could have obtained more than $4 million from the *Triad* defendants. Dr. Long has simply failed to do so. Accordingly, the Court grants Parry's motion for summary judgment with respect to Dr. Long's claim for professional negligence based on Parry's failure to develop and use certain evidence in *Triad*. *See Schweizer v. Mulvehill*, 93 F. Supp. 2d 376, 396 (S.D.N.Y. 2000) (rejecting an aspect of plaintiff's attorney malpractice claim because "Plaintiff's allegation that he would have recovered more if the underlying action had gone to trial . . . does not demonstrate the 'actual and ascertainable' damages necessary for a malpractice claim.").

### 2. Failure to Advise Dr. Long of Tax Consequences

In addition to his claim that Parry's failure to develop certain evidence resulted in a suboptimal settlement, Dr. Long alleges that Parry is liable for professional negligence on the ground that Parry failed to provide him with tax advice regarding the settlement of *Triad*. In support of his claim, Dr. Long acknowledges that Parry advised him to obtain independent tax advice, but asserts that Parry should have done so prior to mediation. Had Parry provided such timely advice, Dr. Long submits that he would have received a greater amount of net proceeds from the settlement. Parry now moves for summary judgment on Dr. Long's claim, contending that the provision of tax advice was outside the scope of his representation and that

the tax advice he provided was sufficient to defend against a
claim of malpractice.

The undisputed facts demonstrate that Dr. Long cannot
establish a prima facie case of professional negligence with
respect to Parry's provision of tax advice.  To begin, Dr. Long
hired Parry to represent him in his affirmative suit against NMC
in connection with his departure from the hospital.  ECF No.
102-2 Ex. HH at 1.  The Contingent Fee Agreement signed by the
parties did not include any language regarding the provision of
tax advice, ECF No. 102-2 Ex. HH, and Dr. Long does not contest
the fact that he did not retain Parry to provide tax counsel.
Thus, because the scope of representation was plainly limited to
the merits of Dr. Long's suit, Parry had no duty to provide Dr.
Long with extensive advice regarding the tax consequences of his
settlement.

Moreover, insofar as brief tax advice with respect to the
settlement was reasonably related to the scope of
representation, Parry adequately provided such advice.  Dr. Long
acknowledges that Parry advised him to consult with his
accountants regarding the settlement, yet he claims that Parry's
advice was insufficient, as it came after the terms of the
settlement had already been negotiated.  The undisputed facts
belie Dr. Long's argument.  The Agreement after Mediation itself
did not contain any provisions regarding the timing or

distribution of the settlement payment.  ECF No. 102-2 Ex. KK.

Furthermore, Parry and Dr. Long continued to negotiate the terms

of the settlement after the mediation, including the timing of

the settlement payment.  *See* ECF No. 102-2 Ex. PPP.  Based on

those facts, there is no reason to believe that Parry's advice

was untimely.  Thus, because the undisputed evidence

demonstrates that Parry did not breach his duty to Dr. Long with

respect to the provision of tax advice, Dr. Long cannot maintain

that claim for professional negligence.

### 3. Failure to Advise Dr. Long Regarding Costs of Litigation

Next, Dr. Long claims that Parry is liable for professional

negligence on the ground that Parry misinformed him regarding

his obligation to pay the costs and fees of the *Triad*

litigation.  Such a claim cannot proceed.  The Contingent Fee

Agreement signed by both parties plainly indicates that Dr. Long

was responsible for "underwrit[ing] all court costs and other

out-of-pocket expenses incurred by Parry in the investigation

and prosecution of [my] claims."  ECF No. 102-2 Ex. HH at 1.

Even assuming that Parry later misinformed Dr. Long that his

firm would absorb such expenses, Dr. Long's alleged damages are

far too speculative to survive a motion for summary judgment.

Dr. Long claims that, but for Parry's misinformation

regarding his obligation to pay the costs and fees of

litigation, he would have renegotiated the Contingent Fee

Agreement with Parry to ensure that Parry would cover the $30,000 of expenses.  Yet, despite Parry's alleged interest in settling the suit for "as little as $1 million," *see* ECF No. 135-2 at 8, there is simply no evidence suggesting that Parry would have agreed to alter the parties' written contract.  In fact, Parry's willingness to file a declaratory judgment action regarding the disputed fees suggests the contrary.  *See* ECF No. 102-2 Ex. FFFF.  Accordingly, the Court grants Parry's motion for summary judgment with respect to Dr. Long's claim for professional negligence based on the alleged misinformation he received from Parry regarding the costs and fees of litigation.[10]

### 4. Failure to Obtain a Fair Hearing

Dr. Long further claims that Parry was negligent in failing to seek a fair hearing.  As this Court has already ruled, Dr. Long waived his right to a fair hearing when he voluntarily resigned from NMC in April 2004.  Dr. Long did not retain Parry until October 2004.  ECF No. 102-2 Ex. HH.  Because Dr. Long had waived his right to a fair hearing by the time he hired Parry, he cannot show that Parry's failure to seek a hearing caused him any damages.  The Court therefore grants this portion of Parry's motion for summary judgment.

---

[10] Although the parties do not address this issue, the Court notes as well that Parry ultimately did absorb the costs and fees of the *Triad* litigation when he released the disputed $38,403 to Dr. Long in April 2010.  ECF No. 102-2 Ex. NNNN.  Such a fact further demonstrates that Dr. Long has failed to show that he suffered any damages.

**5. Failure to Persuade NMC to Void its Adverse Action Report**

Dr. Long's final claim for professional negligence rests on Parry's failure to seek the removal of Dr. Long's adverse action report from the National Practitioner Data Bank ("NPDB"). Once again, Dr. Long's claim cannot survive summary judgment, as he has not demonstrated that Parry's alleged negligence caused him to suffer any damages.

According to Dr. Long, had Parry challenged the adverse action report, he would have been able to successfully withdraw the report from the NPDB. The undisputed facts suggest otherwise. Pursuant to 42 U.S.C. § 11133(a)(1)(B)(i), a health care entity must file a report with the NPDB when it "accepts the surrender of clinical privileges of a physician while the physician is under an investigation by the entity relating to possible incompetence or improper professional conduct." Here, NMC plainly followed that provision when it filed Dr. Long's adverse action report after accepting his resignation while the MEC's recommendations were pending. Dr. Long's bare assertion that the MEC's actions were not an "investigation" within the meaning of the statute is unpersuasive. In stating that the Committee was "deeply concerned as to [Dr. Long's] emotional stability and psychological wellbeing," ECF No. 102-2 Ex. W at 1, the MEC's Memorandum Decision made clear that the hospital was in the process of examining Dr. Long's possible incompetence

54

or improper professional conduct.  Such an inquiry was undoubtedly an "investigation" under the HCQIA.  Thus, because Dr. Long has provided no viable ground upon which his adverse action report could have been withdrawn, he has not shown that Parry's failure to seek removal of the report caused him any damages.  Accordingly, Dr. Long cannot maintain his claim for professional negligence on this theory either.

For all the reasons stated above, the Court **grants** Parry's motion for summary judgment with respect to Count I of the amended complaint, and **denies** both of Dr. Long's cross-motions for partial summary judgment.

### C. Breach of Contract (Count II)

Parry next moves for summary judgment on Dr. Long's claim for breach of contract.  In his amended complaint, Dr. Long alleges that Parry breached a number of express and implied contracts between the two parties.  *See* ECF No. 39 at 39-40. Specifically, he asserts violations of the following agreements:

> 320. Dr. Long explicitly contracted with the defendants to (a) obtain the representation and advice described as competent in Count I, (b) be represented by Parry at all depositions, (c) hire an expert in infectious diseases to opine on the cause of the infections of Dr. Long's patients, (d) hire an economic expert to state damages and opine on antitrust violations, (e) ask Dr. Kirkland about possible sources of infections, (f) finish Dr. Kirkland's deposition, and (g) reimburse Dr. Long for expenses Dr. Long paid before calculating his contingency fee share.

321. The defendants implicitly contracted to (a) give
Dr. Long competent legal advice and representation,
(b) tell him the truth, (c) leave him in charge of
major decisions concerning the objects of the
representation consistent with Vermont Rule of
Professional Conduct 1.2, (d) account to him at
mediation, (e) attempt to have his name removed from
the National Practitioner Data Bank, (f) obtain an
opinion from an expert in infectious diseases in time
to use it in settlement negotiations (including
mediation), (g) obtain an opinion from an expert
economist in time to use it in settlement negotiations
(including mediation), and (h) handle the whole case
without needing help from lawyers outside the
defendant firm.

ECF No. 39 at 39-40.  Parry now seeks judgment as a matter of

law on all of those claims, arguing that as with the

professional negligence claim, Dr. Long has failed to show that

the alleged violations caused him any damages.

Vermont law has long provided that "[f]ailure to prove

damages is fatal to a claim for breach of contract."  *Smith v.*

*Country Vill. Int'l, Inc.*, 944 A.2d 240, 244 (Vt. 2007) (citing

*Dufresne-Henry Eng'g Corp. v. Gilcris Enters.*, 388 A.2d 416,

418-19 (Vt. 1978)).  In the present case, Dr. Long asserts that

his contract damages are the same as the professional negligence

damages that he pleaded in Count I.  ECF No. 39 at 41.  Although

Dr. Long pleaded a variety of damages in Count I, *see* ECF No. 39

at 38-39, it is clear from the amended complaint that the vast

majority of the alleged contractual breaches fall into Dr.

Long's suboptimal settlement theory of damages.  That is, the

purported damages for ¶320(a)-(f) and ¶321(a)-(d),(f),(g) are

the difference between the actual $4 million settlement and the increased settlement or verdict that Dr. Long claims he would have received had Parry not breached his contractual obligations.  As explained in Section I(B) above, however, Dr. Long's suboptimal settlement theory of damages is simply too speculative to support his claim for breach of contract.  The breach of contract claims for the agreements specified in ¶320(a)-(f) and ¶321(a)-(d),(f),(g) are therefore barred as a matter of law.  *See* ECF No. 39 at 39-40.

As to those alleged breaches of contract that rely on alternative theories of damages, the Court has also already addressed the claims presented in ¶320(g) and ¶321(e).  With respect to ¶320(g), Parry ultimately reimbursed Dr. Long for the costs and fees of the *Triad* litigation when he released the disputed $38,403 to Dr. Long in April 2010.  ECF No. 102-2 Ex. NNNN.  Dr. Long has thus failed to establish that he suffered any damages from that purported breach.  Additionally, regarding ¶321(e), the Court has found that Dr. Long has failed to show that there were viable grounds upon which Parry could have withdrawn the adverse action report from the NPDB.  Consequently, Dr. Long has not established damages for that claim either.

Finally, Dr. Long alleges in ¶321(h) that Parry entered into an implied-in-fact contract to "handle the whole case

without needing help from lawyers outside the defendant firm."
ECF No. 39 at 40.  Dr. Long further asserts that Parry breached
that implied contract by suggesting that he hire Attorney Karin
Zaner of Kane, Russel, Coleman, & Logan, P.C., *see* ECF No. 135-2
at 8, and that as a result of the breach, he was forced to pay
Zaner $200,000 for her services, ECF No. 39 at 39.[11]

A contract implied in fact differs from an express contract
in that it "is to be inferred from the circumstances, the
conduct, acts or relation of the parties rather than from their
spoken words." *Peters v. Poro's Estate*, 117 A. 244, 246-47 (Vt.
1922).  In order to succeed on such a claim, a plaintiff must
establish both a "mutuality of intent and the lack of ambiguity
in offer and acceptance." *LaRose v. Dep't of Emp't Sec.*, 431
A.2d 1240, 1243 (Vt. 1981) (internal quotation omitted).  Here,
even accepting Dr. Long's version of the facts as true, the
conduct of the parties does not demonstrate an agreement that
Parry would handle the entire case without the assistance of
outside counsel.  Furthermore, even if such an agreement
existed, Dr. Long would not be able to establish a breach.

---

[11] In his amended complaint, Dr. Long also suggests that Parry is responsible
for the fees he paid to Gary McQuesten.  *See* ECF No. 39 at 39.  Yet, nowhere
does Dr. Long indicate that Parry urged him to hire McQuesten.  Given that
Dr. Long had retained McQuesten long before he considered hiring Parry, the
Court finds that even if Dr. Long were to establish the existence of an
implied-in-fact contract, he has offered no evidence of breach with respect
to his continued retention of McQuesten.

To begin, Dr. Long does not allege any facts indicating that the parties had a mutual and unambiguous agreement that Parry would handle the entire case by himself.  To the contrary, Dr. Long asserts that Parry explicitly suggested that he hire Zaner shortly after they filed suit.  ECF No. 102-2 Ex. FF at 338.  Dr. Long then contacted Zaner on his own volition and proceeded to negotiate a separate fee agreement.  *Id.; see also* ECF No. 102-2 Ex. JJ (email from Zaner to Dr. Long describing the fee agreement).  Parry was not a party to the fee agreement between Dr. Long and Zaner, and at the time of signing the agreement, Dr. Long was aware that his obligation to pay Zaner was wholly independent from his obligation to pay Parry.  ECF No. 102-2 Ex. FF at 338-39.  In light of those facts, the parties' behavior in no way suggests that they mutually intended for Parry to work on the case alone.

Moreover, even if Parry had impliedly agreed to handle the entire case without the assistance of outside counsel, his "suggestion" that Dr. Long hire Zaner would not have breached that agreement.[12]  *See* ECF No. 135-2 at 8 (affidavit of Dr. Long indicating that he "contacted the Texas antitrust firm at

---

[12] In fact, if had there been an implied-in-fact contract for Parry to handle the case on his own, Parry's suggestion that Dr. Long hire Zaner combined with Dr. Long's independent negotiation of a separate fee agreement would have served to modify that contract.  *See Foti Fuels, Inc. v. Kurrle Corp.*, 90 A.3d 885, 895 (Vt. 2013) (providing that "[p]arties are generally free to alter or amend the terms of their contractual arrangements by mutual assent provided all requirements are met for a valid contract . . . .").

Parry's suggestion."). As noted above, Dr. Long independently contacted Zaner and negotiated a separate fee agreement. ECF No. 102-2 Ex. FF at 338-39. Parry was uninvolved in that arrangement, and his mere suggestion that Dr. Long hire Zaner would not have amounted to a breach. Thus, because Dr. Long has failed to demonstrate both the existence of an implied-in-fact contract, and a violation of the professed agreement, the breach of contract claim raised in ¶321(h) cannot proceed as a matter of law.

For the reasons explained above, the Court **grants** Parry's motion for summary judgment with respect to Count II of the amended complaint.

### D. Breach of Fiduciary Duty (Count III)

Parry also moves for summary judgment on Dr. Long's claim for breach of fiduciary duty. In his amended complaint, Dr. Long submits that Parry violated his responsibilities as a fiduciary by (1) asking Dr. Long to sign a retainer that required him to obtain Parry's consent prior to settling his case; (2) failing to advise Dr. Long that the consent provision was unusual or that he should seek independent counsel before agreeing to such a provision; and (3) threatening to withdraw from Dr. Long's case if Dr. Long did not accept NMC's settlement offer or asked NMC to void its adverse action report to the NPDB. ECF No. 39 at 41. Parry now argues that judgment in his

favor is warranted on two separate grounds.  First, he maintains that Dr. Long has failed to establish his claimed damages, and second, he argues that his purported transgressions did not breach his fiduciary duty.

Under Vermont law, proof of damages is an essential element of any claim for breach of fiduciary duty.  *See Green Mt. Inv. Corp. v. Flaim*, 807 A.2d 461, 646 (Vt. 2002).  Here, Dr. Long claims that Parry's alleged breach of his fiduciary responsibilities caused Dr. Long to accept an inadequate settlement.  ECF No. 39 at 41.  As discussed at length in Section I(B), due to the significant weaknesses in Dr. Long's underlying case, his claim that he would have received more than $4 million had Parry not committed the alleged transgressions is too speculative to establish the element of damages.  Because Dr. Long has failed to make a showing sufficient to establish an essential element of his cause of action, his claim cannot proceed.  Accordingly, the Court **grants** Parry's motion for summary judgment with respect to Count III of the amended complaint.

### E. Violation of Consumer Protection Laws (Count IV)

Parry next seeks summary judgment on Dr. Long's consumer protection claim.  In his amended complaint, Dr. Long alleges that he relied on several false and fraudulent representations in deciding to retain Parry.  Specifically, he asserts that

Parry (1) implicitly misrepresented his ability to handle an antitrust claim without substantial outside help; (2) did not inform Dr. Long that the settlement consent provision in the Contingent Fee Agreement violated the Vermont Rules of Professional Conduct; (3) misled Dr. Long into believing that he had taken the necessary steps to obtain the opinion of an infectious disease expert; and (4) failed to tell Dr. Long that he needed to hire local counsel from Vermont.  ECF No. 39 at 41-42.

The parties initially dispute the source of law that governs Dr. Long's consumer protection claim.  Dr. Long submits that Vermont law applies to his claim, whereas Parry contends that the law of Pennsylvania controls.

As the Court acknowledged earlier in this case, *see* ECF No. 26 at 8, "[a] federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)).  Vermont, as the forum state, "has adopted the Restatement (Second) of Conflicts [of Laws] for choice-of-law questions in both tort and contract cases." *McKinnon v. F.H. Morgan & Co.*, 750 A.2d 1026, 1028 (Vt. 2000).

In conducting a choice-of-law analysis, the Court must first determine whether the laws of the relevant jurisdictions

62

truly conflict.  *See Havill v. Woodstock Soapstone Co.*, 783 A.2d 423, 427 (Vt. 2001) (citing *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir. 1997) (under general conflict of law principles, where the laws of the two jurisdictions would produce the same result, the court should avoid the choice-of-law question)).  Here, as the parties recognize, an attorney's liability for a consumer protection violation differs significantly under the laws of Vermont and Pennsylvania.  Pursuant to Vermont law, the state consumer protection act applies to attorney misrepresentations that affect "[t]he commercial, entrepreneurial aspects of the practice of law," including "advertising, billing and collection practices, fee arrangements, and methods of obtaining, retaining and dismissing clients." *Kessler v. Loftus*, 994 F. Supp. 240, 243 (D. Vt. 1997).  In Pennsylvania, by contrast, the state's consumer protection statute does not apply to attorney misconduct.  *See Beyers v. Richmond*, 937 A.2d 1082 (Pa. 2007).

Given the clear conflict between the laws of Vermont and Pennsylvania, the Court must next "ascertain whether a specific section of the Restatement governs what law should ordinarily apply to the particular action or legal issue." *Martineau v. Guertin*, 751 A.2d 776, 778 (Vt. 2000).  Section 148 of the Restatement addresses claims of fraud and misrepresentation.  In particular, subsection (2) provides:

When the plaintiff's action in reliance took place in
whole or in part in a state other than that where the
false representations were made, the forum will
consider such of the following contacts, among others,
as may be present in the particular case in
determining the state which, with respect to the
particular issue, has the most significant
relationship to the occurrence and the parties:

(a)  The place, or places, where the plaintiff acted
in reliance upon the defendant's representations,
(b)  The place where the plaintiff received the
representations,
(c)  The place where the defendant made the
representations,
(d)  The domicil, residence, nationality, place of
incorporation and place of business of the parties,
(e)  The place where a tangible thing which is the
subject of the transaction between the parties was
situated at the time, and
(f)  The place where the plaintiff is to render
performance under a contract which he has been induced
to enter by the false representations of the
defendant.

Restatement (Second) of Conflict of Laws § 148(2) (1971).

In the present case, Dr. Long's consumer protection claim

arises out of the contact he had with Parry in the fall of 2004

prior to his decision to sign the Contingent Fee Agreement.

There is no dispute that Parry's alleged false representations

were made from his office in Pennsylvania.  In addition, Dr.

Long acknowledges that his action in reliance on Parry's

representations--that is, his retention of Parry's services--

also took place, at least in part, in Pennsylvania.  Dr. Long

met with Parry at his office in Philadelphia on several

occasions prior to contracting for his services, ECF No. 102-2

Ex. FF at 81, and Dr. Long ultimately signed the Contingent Fee Agreement in Parry's office in October 2004, ECF No. 102-2 Ex. FF at 80.  Even assuming that Dr. Long received some of the purported misrepresentations in Vermont, and that he made the decision to ultimately retain Parry while in Vermont, a review of the pertinent facts indicates that Pennsylvania has the most significant relationship to the occurrence and the parties.

On balance, the factors specified in the Restatement favor a finding that Pennsylvania law applies to Dr. Long's claim. Factors (a), (b), and (d) cut in both directions, as Dr. Long may have received and acted on the alleged misrepresentations in both Vermont and Pennsylvania, and Dr. Long and Parry resided in Vermont and Pennsylvania, respectively.  Factors (e) and (f) are also relatively inconsequential, as there was no "tangible thing" that was the subject of the transaction, and modern technology allowed Dr. Long to pay Parry's fees from anywhere. Factor (d), however, strongly supports the conclusion that Pennsylvania law controls the claim at hand.  As stated previously, all of Parry's purportedly false representations were made in Pennsylvania.  Moreover, the relationship that Dr. Long and Parry established prior to signing the Contingent Fee Agreement was predominantly formed in Pennsylvania.  Parry was not licensed to practice law in Vermont, he did not advertise his services in Vermont, and he did not take any affirmative

steps to solicit business in Vermont.  ECF No. 102-2 Ex. S at 1.
Rather, Dr. Long contacted Parry in Pennsylvania to discuss the
possibility of contracting for Parry's services, ECF No. 102-2
Ex. GG at 2, and he later met with Parry in Pennsylvania to sign
the Contingent Fee Agreement, ECF No. 102-2 Ex. FF at 80.  Other
than Dr. Long's residence, there is simply no fact that strongly
ties the parties' pre-contract relationship to the state of
Vermont.

Nonetheless, Dr. Long argues that Vermont law should apply
because the *Triad* suit was eventually litigated in Vermont.
Such an argument is unpersuasive.  Given the nature of Dr.
Long's claim, the focus of the Court's analysis is not which
state had a stronger relationship with the litigation, but
rather which state had a stronger relationship to the parties
during their dealings that gave rise to Dr. Long's consumer
protection claims.  For the reasons explained above, the Court
finds that Pennsylvania had the most significant ties to the
parties and their dealings at that time.  Accordingly, Dr.
Long's claim is governed by Pennsylvania law, which bars
consumer protection actions based on attorney misconduct.  *See
Beyers*, 937 A.2d 1082.  The Court therefore **grants** Parry's
motion for summary judgment with respect to Count IV of the
amended complaint.

66

**F. Abuse of Process (Count V)**

Parry further moves for summary judgment on Dr. Long's abuse of process claim.  Under Vermont law,[13] "a plaintiff alleging the tort of abuse of process must plead and prove: 1) an illegal, improper or unauthorized use of a court process; 2) an ulterior motive or an ulterior purpose; and 3) resulting damage to the plaintiff."  *Jacobsen v. Garzo*, 542 A.2d 265, 268 (Vt. 1988).  Each element of an abuse of process claim is separate and distinct, and thus, "the *proper* use of . . . legal process (even though used for a bad intention and to satisfy malicious intentions) is not actionable."  *Id.* at 267-68 (emphasis in original) (internal citation omitted).

In this case, Dr. Long bases his claim for abuse of process on the declaratory judgment action that Parry filed in Pennsylvania in December 2008.  Parry brought that action seeking a judgment that he was entitled to the $38,403 in disputed fees from the *Triad* settlement as per the express terms of the Contingent Fee Agreement.  *See* ECF No. 102-2 Ex. FFFF. Dr. Long opposed Parry's suit on the ground that Parry had orally modified the parties' written fee agreement, and he now argues that he has produced evidence sufficient to establish that Parry's action constituted an abuse of process.  First, he

---

[13] Dr. Long expresses uncertainty as to whether the present cause of action is governed by the substantive law of Vermont or Pennsylvania.  The Court addressed that question in a previous Order, holding that Vermont law applies to Dr. Long's abuse of process claim.  *See* ECF No. 26 at 9.

asserts that Parry's suit was an improper use of court process,
for Parry (1) filed the complaint "with a plan to dismiss it
rather than reach its authorized conclusion if expenses
threaten[ed] to exceed possible recovery;" (2) improperly
designated the suit as a declaratory judgment action in order to
avoid arbitration; (3) failed to join all affected parties; and
(4) produced discovery only upon a court order.  ECF No. 135 at
69-70.  Second, Dr. Long claims that Parry had an ulterior
purpose in filing the action, as evidenced by his offer to
dismiss the suit in exchange for a general release from Dr.
Long.  Third, Dr. Long submits that he suffered damages in the
form of legal fees and expenses.  For his part, Parry contends
that summary judgment is appropriate because Dr. Long has failed
to establish an improper use of court process.

Even accepting the argument that Parry filed the
declaratory judgment action with an ulterior purpose of securing
a general release from liability, Dr. Long's abuse of process
claim cannot proceed, as the evidence does not establish "an
illegal, improper or unauthorized use of a court process." *See*
*Jacobsen*, 542 A.2d at 268.  To begin, although Parry ultimately
dismissed the suit given the costs of litigation, Dr. Long has
not presented any evidence indicating that Parry filed the
action with that plan in mind.  Moreover, the cost of litigation
is a common factor that parties consider when determining how

best to proceed in a lawsuit, and Dr. Long has similarly failed
to demonstrate that a decision to dismiss an action based on
such costs is improper.  Next, Dr. Long has not provided any
support for his claims that Parry improperly designated the suit
as a declaratory judgment action and that Parry did not join all
affected parties.  Under Pennsylvania law, it is proper to use a
declaratory judgment action to resolve a contract dispute, *see*
*York-Green Assocs. v. Bd. of Supervisors of S. Hanover Twp.*, 486
A.2d 561, 564 (Pa. Commw. Ct. 1985), and Parry and Dr. Long were
the only signatories of the Contingent Fee Agreement.  Finally,
with respect to Dr. Long's attempt to prove his claim based on
the fact that Parry turned over discovery only upon a court
order, Dr. Long has failed to establish that a breach of the
civil discovery rules alone qualifies as an improper use of
court process.  *See, e.g.*, *Flores v. Emerich & Fike*, 416 F.
Supp. 2d 885, 907 (E.D. Cal. 2006) (holding that "[a civil
discovery rules] violation, on its own, does not constitute an
abuse of process.").  For the reasons stated above, Dr. Long has
not provided sufficient evidence to establish that Parry's
declaratory judgment action was an illegal, improper, or
unauthorized use of a court process.  Accordingly, the Court
**grants** Parry's motion for summary judgment with respect to
Count V of the amended complaint.

### G. Malicious Prosecution (Count VI)

Finally, Parry moves for summary judgment on Dr. Long's claim for malicious prosecution.  Under Vermont law, malicious prosecution requires a showing "that a party instituted a proceeding against the individual without probable cause, that the party did so with malice, that the proceeding terminated in the individual's favor, and that the individual suffered damages as a result of the proceeding." *Siliski v. Allstate Ins. Co.*, 811 A.2d 148, 151 (Vt. 2002) (citing *Chittenden Trust Co. v. Marshall*, 507 A.2d 965, 969 (Vt. 1986)).  In order to establish a lack of probable cause, a party must show that "there was no objectively reasonable basis to bring the action." *Bacon v. Reimer & Braunstein, LLP*, 929 A.2d 723, 726 (Vt. 2007) (citing W. Keeton, Prosser & Keeton on the Law of Torts § 120, at 893-94 (5th ed. 1984) (probable cause standard in civil actions merely requires that facts and law would support a "reasonable chance" of prevailing on the claim)).

Here, as with the claim for abuse of process, Dr. Long's claim for malicious prosecution arises from the declaratory judgment action that Parry filed in Pennsylvania to determine the parties' rights regarding the disputed $38,403 of the *Triad* settlement proceeds.  In his motion for summary judgment, Parry submits that the Court should enter judgment in his favor due in part to Dr. Long's failure to establish a lack of probable

70

cause.  Dr. Long responds that the question of probable cause
must be decided by a jury, as there is a factual dispute as to
whether Parry orally agreed that his firm would absorb the costs
of litigation.

Dr. Long's argument is misplaced.  "[W]here there is a
dispute between two parties to a contract as to their rights and
obligations under that contract," a declaratory judgment action
provides "an appropriate and adequate legal remedy." *York-Green*
*Assocs.*, 486 A.2d at 564.  In the present matter, Dr. Long
plainly acknowledges that the parties were engaged in a fee
dispute at the time Parry filed the action for declaratory
judgment.  Indeed, Parry claimed that he was entitled to the
disputed funds due to the explicit language in the Contingent
Fee Agreement obligating Dr. Long to cover the costs and fees of
litigation, *see* ECF No. 102-2 Ex. HH at 1, whereas Dr. Long
maintained that the funds belonged to him on the ground that
Parry allegedly agreed to absorb such expenses, ECF No. 102-2
Ex. FF at 327.  The parties' disagreement over their rights to
the disputed funds, however, does not prevent this Court from
ruling on Dr. Long's claim for malicious prosecution as a matter
of law.  To the contrary, the very fact that the parties were
engaged in such a dispute, coupled with the purpose of a
declaratory judgment action, establishes that Parry had an
objectively reasonable basis for filing suit.  *See Gunlac v. S.*

71

*Butler Cnty. Sch. Dist.*, 587 A.2d 699, 701 (Pa. 1991) (holding that "[t]he presence of antagonistic claims indicating imminent and inevitable litigation coupled with a clear manifestation that the declaration sought will be of practical help in ending the controversy are essential to the granting of relief by way of declaratory judgment."). Because the parties' competing claims provided Parry with reasonable grounds for seeking declaratory relief, Dr. Long cannot show that Parry initiated the action without probable cause. The Court therefore **grants** Parry's motion for summary judgment on Count VI of the amended complaint.

## II. Dr. Long's Motion to Amend (ECF No. 97)

The Court next turns to Dr. Long's motion for leave to file a second amended complaint. Under Federal Rule of Civil Procedure 15(a)(2), a court should freely give leave to amend "when justice so requires." That said, "[a] district court has the discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

In the present motion, Dr. Long seeks to amend his complaint in several ways. First, Dr. Long wishes to make several grammatical and small substantive changes to the existing counts in the amended complaint. Second, he seeks to

72

add to the amended complaint a claim of deceit.  Third, he requests to add to the amended complaint a claim of fraud.  *See* ECF No. 98.  Both of Dr. Long's proposed claims rest on the theory that "[a]t some point between 2004 and 2008, Parry began to represent Dr. Long's interests less than he represented the interests of one or more of the underlying defendants or Parry's own interests, or both."  ECF No. 98-1 at 47.

Initially, the Court denies Dr. Long's request to make minor changes to the existing counts in the amended complaint, as none of the proposed edits impact the Court's analysis of Dr. Long's claims, and the Court has entered judgment on those claims as a matter of law.  Turning next to Dr. Long's request to add claims of deceit and fraud, Parry argues that such a request should be denied on the ground that the proposed claims would be futile.  "An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."  *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).  Accordingly, a proposed claim will be rejected as futile if it does not "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Under Vermont law,[14] "[a]n action for fraud and deceit will lie upon an intentional misrepresentation of existing fact, affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was relied on by the defrauded party to his damage." *Lewis v. Cohen*, 603 A.2d 352, 354 (Vt. 1991).  In his proposed claims, Dr. Long asserts that Parry made an intentional misrepresentation of existing fact when he "implied or stated that he would advocate for Dr. Long . . . be loyal to Dr. Long . . . and [be] honest with [Dr. Long] from when he contracted to represent Dr. Long until after the *Triad* settlement was consummated."  ECF No. 98-1 at 45.  Such statements were intentional misrepresentations, Dr. Long submits, for Parry later "betrayed" him by colluding with NMC and "intentionally leading him to settle for much less than he should have."  ECF No. 103 at 5-7.  In support of his theory, Dr. Long principally asserts that Parry purposefully avoided obtaining an expert opinion on the cause of his patients' infections prior to mediation, as evidenced by Parry's inconsistent deposition testimony regarding his contact with two potential experts.  *See* ECF No. 103 at 5-7.

---

[14] Notwithstanding the choice-of-law analysis conducted in Section I.E above, the Court applies Vermont law to Dr. Long's proposed claims of deceit and fraud, as it does not conflict with the law of Pennsylvania.  *Compare Kit v. Mitchell*, 771 A.2d 814, 819 (Pa. 2001), *with Lewis*, 603 A.2d at 354.

The allegations set forth by Dr. Long fail to satisfy the plausibility standard established in *Iqbal*. *See* 556 U.S. at 678. Even accepting as true Dr. Long's assertion that Parry deliberately failed to acquire the opinion of an infectious disease expert in advance of mediation, Dr. Long has given the Court no reason to infer that Parry "made a deal with NMC to induce Dr. Long to settle the case relatively cheaply." ECF No. 103 at 3. As the Supreme Court noted, although the plausibility standard is not akin to a "probability requirement," it does ask "for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. In the present motion, the facts pleaded by Dr. Long establish nothing more than a mere speculative possibility that Parry intentionally misrepresented his loyalty to Dr. Long. Dr. Long has therefore failed to state a claim for relief that is plausible on its face. Accordingly, the Court **denies** Dr. Long's motion for leave to file a second amended complaint.

### III. Parry's Motion for Sanctions (ECF No. 123) and Motions to Seal (ECF Nos. 137, 138, & 156)

Finally, the Court addresses Parry's motion for sanctions, as well as his three motions to seal. In his motion for sanctions (ECF No. 123), Parry asserts that Dr. Long violated both the Court's Protective Order in *Triad* and the Court's July

8, 2015 Order in the present case (ECF No. 94)[15] by distributing
137 pages of documents subject to the *Triad* Protective Order to
the attorney of several witnesses.  As sanctions for the alleged
violation, Parry requests an order (1) prohibiting Dr. Long from
contesting that the peer review process conducted by NMC met the
standards of the HCQIA; and (2) precluding the deposition in
this matter of any member of NMC's Medical Executive Committee
or Surgical Service Subcommittee for Quality Assurance who
participated in the peer review of Dr. Long.  Dr. Long responds
that such sanctions are unwarranted because the documents at
issue were not covered by the *Triad* Protective Order.

     With respect to Parry's motions to seal, the first motion
(ECF No. 137) asks the Court to seal the 137 pages of disputed
documents that form the basis of Parry's motion for sanctions.
The second motion (ECF No. 138) addresses a separate set of
documents, asking the Court to seal six exhibits attached to Dr.
Long's opposition to summary judgment (ECF No. 135) on the
ground that they too fall within the scope of the *Triad*
Protective Order.  For the same reason, the third motion (ECF
No. 156) requests that the Court seal 23 exhibits attached to
Dr. Long's second motion for partial summary judgment.  With the
exception of one exhibit attached to his response to Parry's
motion for summary judgment, Dr. Long argues that none of the

---

[15] In its July 8, 2015 Order, the Court ordered the parties to comply with the
*Triad* Protective Order.

documents at issue fall within the scope of the *Triad* Protective Order.[16]

The Court first addresses Parry's request to seal the documents at issue in his motion for sanctions.  Having reviewed the relevant materials, the Court holds that the bulk of the documents are subject to the *Triad* Protective Order.  The *Triad* Protective Order plainly covered "information protected by an applicable peer review privilege," ECF No. 125-1 at 1, and indicated that protected material "shall bear the legend 'Confidential Information – Subject to Protective Order' (or a substantial equivalent)," ECF No. 125-1 at 2-3.  With the exception of just three pages (ECF No. 137-1 at 15, 61, 62), all of the documents attached to Parry's first motion to seal are labelled as either "confidential" or "subject to peer review privilege."  *See* ECF No. 137-1.  Given those labels, as well as the documents' clear connection to Dr. Long's peer review process, the Court finds that with some exceptions,[17] the

---

[16] In his response to Parry's third motion to seal, Dr. Long also argues that Parry lacks standing to enforce the *Triad* Protective Order because he was not a signatory to the order.  ECF No. 157 at 3.  Setting aside the fact that Parry was an attorney in the underlying action, the Court rejects Dr. Long's argument, as its July 8, 2015 Order in this case requires the present parties to comply with the terms of the protective order in *Triad*.  *See* ECF No. 94.

[17] Pages 15, 61, and 62 of Exhibit 1 to Parry's first motion to seal (ECF No. 137-1 at 15, 61, 62) are not subject to the *Triad* Protective Order because they are in no way marked as confidential.  In addition, pages 21, 36, 44, 58-60, 66-70, 91, 96, 103-09, 111, and 129-33 (ECF No. 137-1 at 21, 36, 44, 58-60, 66-70, 91, 96, 103-09, 111, 129-33) are not subject to the *Triad* Protective Order because they include documents either originated by Dr. Long or sent directly to Dr. Long prior to the start of litigation, and the protective order did not restrict a party's use of "its own documents or

documents attached to Parry's first motion to seal (ECF No. 137) are subject to the *Triad* Protective Order.  Accordingly, the Court orders that those documents remain sealed.  The Court further orders that the documents be "destroyed or returned to the attorney for the responding party producing and providing the Confidential Information," as dictated by the *Triad* Protective Order.  *See* ECF No. 125-1 at 5-6.

The Court next turns to Parry's request to seal six exhibits attached to Dr. Long's opposition to summary judgment (ECF No. 135).  The six exhibits at issue are Exhibit 3 (ECF No. 135-4), Exhibit 9 (ECF No. 135-10), Exhibit 15 (ECF No. 135-16), Exhibit 21 (ECF No. 135-22), Exhibit 23 (ECF No. 135-24), and Exhibit 35 (ECF No. 135-36).  Dr. Long concedes that Exhibit 21 is covered by the *Triad* Protective Order.  *See* ECF No. 139. With respect to the remaining exhibits, the Court has reviewed the relevant documents and finds as follows: Exhibit 3 is not subject to the *Triad* Protective Order because the document was in Dr. Long's possession prior to the start of the *Triad* litigation; the remaining exhibits are subject to the protective order, as they are plainly labelled as confidential and relate to Dr. Long's peer review.  Accordingly, the Court orders that Exhibit 9 (ECF No. 135-10), Exhibit 15 (ECF No. 135-16), Exhibit 21 (ECF No. 135-22), Exhibit 23 (ECF No. 135-24), and Exhibit 35

---

materials" or "documents or materials obtained by a party before this Protective Order was signed."  *See* ECF No. 125-1 at 6.

(ECF No. 135-36) be sealed, and destroyed or returned by the parties.  Exhibit 3 (ECF No. 135-4), however, need not be sealed, destroyed, or returned.

Finally, the Court addresses Parry's request to seal 23 exhibits attached to Dr. Long's second motion for partial summary judgment.  Upon reviewing the documents at issue, the Court finds that the following exhibits are subject to the *Triad* Protective Order, as they are clearly marked as confidential and relate to Dr. Long's peer review: Exhibit 2 (ECF No. 154-3), Exhibit 5 (ECF No. 154-6), Exhibit 7 (ECF No. 154-8), Exhibit 10 (ECF No. 154-11), Exhibit 16 (ECF No. 154-17), Exhibit 18 (ECF No. 154-19), Exhibit 19 (ECF No. 154-20), Exhibit 20 (ECF No. 154-21), Exhibit 21 (ECF No. 154-22), Exhibit 24 (ECF No. 154-25), Exhibit 25 (ECF No. 154-26), Exhibit 26 (ECF No. 154-27), Exhibit 28 (ECF No. 154-29), Exhibit 31 (ECF No. 154-32), and Exhibit 37 (ECF No. 154-38).  The Court therefore orders that those exhibits be sealed, and destroyed or returned by the parties.  By contrast, the Court finds that the documents listed below do not fall within the purview of the *Triad* Protective Order, for they were either created by Dr. Long or possessed by him before the start of the *Triad* litigation: Exhibit 3 (ECF No. 154-4), Exhibit 6 (ECF No. 154-7), Exhibit 11 (ECF No. 154-12), Exhibit 12 (ECF No. 154-13), Exhibit 13 (ECF No. 154-14), Exhibit 14 (ECF No. 154-15), Exhibit 33 (ECF No. 154-34), and

Exhibit 34 (ECF No. 154-35).  Those documents are not required to be sealed, destroyed, or returned by the parties.

As explained above, the Court **grants in part and denies in part** Parry's motion to file documents under seal (ECF No. 137), Parry's motion to seal exhibits to Dr. Long's opposition to summary judgment (ECF No. 138), and Parry's motion to seal exhibits to Dr. Long's second motion for partial summary judgment (ECF No. 156).  Because the Court has granted Parry's motion for summary judgment, his motion for sanctions (ECF No. 123) is **denied** as moot.

### CONCLUSION

The Court **grants** Parry's motion for summary judgment (ECF No. 102), and **denies** Dr. Long's cross-motions for partial summary judgment (ECF Nos. 142 & 154) and motion for leave to file a second amended complaint (ECF No. 97).  The Court also **grants in part and denies in part** Parry's motion to file documents under seal (ECF No. 137), Parry's motion to seal exhibits to Dr. Long's opposition to summary judgment (ECF No. 138), and Parry's motion to seal exhibits to Dr. Long's second motion for partial summary judgment (ECF No. 156).[18]  As the case

---

[18] With respect to Parry's motion to file documents under seal (ECF No. 137), the Court has found that all documents attached to that motion as Exhibit 1 are subject to the *Triad* Protective Order and should be sealed, except the following: ECF No. 137-1 at 15, 21, 36, 44, 58-62, 66-70, 91, 96, 103-09, 111, 129-33.  As to Parry's motion to seal exhibits to Dr. Long's opposition to summary judgment (ECF No. 138), the Court has found that the following exhibits to Dr. Long's opposition to summary judgment are subject to the *Triad* Protective Order and should be sealed: Exhibit 9 (ECF No. 135-10),

is now dismissed, the Court **denies** as moot Parry's motion for

sanctions (ECF No. 123), Parry's motion to strike and exclude

the report and opinions of William Jarvis, M.D. (ECF No. 107),

and the motion to quash subpoenas to testify at a deposition

filed by non-parties Steven Sobel, M.D. and Kathryn Kirkland,

M.D. (ECF No. 111).

Dated at Burlington, in the District of Vermont, this 29th

day of February, 2016.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge

---

Exhibit 15 (ECF No. 135-16), Exhibit 21 (ECF No. 135-22), Exhibit 23 (ECF No.
135-24), and Exhibit 35 (ECF No. 135-36).  Finally, regarding Parry's motion
to seal exhibits to Dr. Long's second motion for partial summary judgment
(ECF No. 156), the Court has found that the following exhibits are subject to
the *Triad* Protective Order and should be sealed: Exhibit 2 (ECF No. 154-3),
Exhibit 5 (ECF No. 154-6), Exhibit 7 (ECF No. 154-8), Exhibit 10 (ECF No.
154-11), Exhibit 16 (ECF No. 154-17), Exhibit 18 (ECF No. 154-19), Exhibit 19
(ECF No. 154-20), Exhibit 20 (ECF No. 154-21), Exhibit 21 (ECF No. 154-22),
Exhibit 24 (ECF No. 154-25), Exhibit 25 (ECF No. 154-26), Exhibit 26 (ECF No.
154-27), Exhibit 28 (ECF No. 154-29), Exhibit 31 (ECF No. 154-32), and
Exhibit 37 (ECF No. 154-38).